UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
Melvin Santiago, *pro se*,                          :
                                                    :
                        Plaintiff,                  :
                                                    :        **OPINION AND ORDER**
        -against-                                   :        06-CV-6580 (DLI)
                                                    :
Commissioner of Social Security,                    :
                                                    :
                        Defendant.                  :
-------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff Melvin Santiago, proceeding *pro se*, filed an application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act (the "Act") on December 26, 2002. Plaintiff's application was denied initially and on reconsideration. Plaintiff, then represented by counsel, testified at a hearing held before an Administrative Law Judge ("ALJ") on March 17, 2005. By decision dated August 17, 2005, the ALJ concluded that plaintiff was not disabled within the meaning of the Act. On November 2, 2006, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review. Plaintiff filed the instant action seeking judicial review of the denial of SSI and DIB benefits pursuant to 42 U.S.C. § 405(g) and 1383(c)(3). The Commissioner now moves for judgment on the pleadings pursuant to Federal Rules of Civil Procedure 12(c), contending that substantial evidence supports the ALJ's finding that plaintiff is not disabled and is capable of performing medium-level work. For the reasons set forth more fully below, the Commissioner's motion is granted in its entirety.

# BACKGROUND

## A.     Non-medical and Testimonial Evidence

Plaintiff, a forty-eight year old high school graduate with one year of college, worked as a driver and courier for twenty-four years. (R. 59, 85-89.[1])  Plaintiff's responsibilities included delivering packages of up to seventy-five pounds with the aid of a small hand truck. (R. 86.)  Plaintiff did not need technical knowledge or skills to perform these duties. (R. 85.)  According to plaintiff, the onset of his disability occurred on December 19, 2002 after he had an epileptic seizure at work, which caused him to lose consciousness.[2] (R. 85, 92.)  Plaintiff asserts that he is entitled to DIB and SSI because of epilepsy. (Compl. ¶ 4.)

Plaintiff lives with his girlfriend who cooks for him and reminds him to take his medicine. (R. 95, 97, 103.)  When plaintiff's girlfriend doesn't prepare his meals, he eats at a diner or orders pizza, because he cannot cook. (R. 96, 105.)  He does not do chores. (R. 106.)  Plaintiff also stated that he cannot shop, drive, or play sports due to epilepsy. (R. 98-99.)  Plaintiff spends his days reading books and watching television. (R. 103, 104.)  Plaintiff can handle money and visits his father's home on a regular basis, using public transportation to travel. (R. 99, 106-07.)  Plaintiff can walk for about one block before needing to rest for twenty minutes. (R. 101, 109.)  He does not finish what he starts due because he is constantly tired and does not feel well. (R. 98, 101.)  Plaintiff stated that his condition affects his ability to lift, stand, walk, sit, kneel, squat, reach, and talk. (R. 100.)

---

[1] "R." refers to the administrative record filed by defendant in this case.
[2] The record indicates that plaintiff earned $3,237.60 in 2003. (R. 70.)  Plaintiff's doctor also reported that after a period of absence, plaintiff briefly returned to work on February 16, 2003. (R. 150.)

During the March 17, 2005 hearing[3] before the ALJ, plaintiff testified that he had a history of poor compliance with taking his prescribed anti-seizure medication because it was "not doing the job" and could damage his liver. (R. 408.) His doctor prescribed "Keppra instead of Dilantin," and he sometimes forgets to take it. (R. 408-09.) Plaintiff testified that he had taken his medication every day for the sixty days prior to the hearing and that, during that time period, he experienced one seizure on February 28, 2005. (R. 409-10.) Plaintiff also testified that before the February 28, 2005 seizure, he experienced a seizure in July 2004. (R. 410.)

**B.    Medical Evidence**

Plaintiff visited a neurologist, Dr. Allamprahbu Patil, in March 2000, and continued visiting him regularly until after the date of the hearing. (R. 87-88.) Dr. Patil performed various physical examinations of plaintiff, monitored any seizure activity, and prescribed medication to control plaintiff's seizures, including Dilantin. (R. 86-89.) Plaintiff has experienced seizures since age sixteen.[4] (R. 337.)

The alleged onset of plaintiff's disability occurred on December 19, 2002, when plaintiff experienced a seizure and lost consciousness while driving a van at work. (R. 121.) An ambulance brought him to St. Clare's Hospital and Health Center, though he had not suffered an injury. (R. 120-22.) Plaintiff was alert and not in distress. (R. 121.) A blood test revealed that plaintiff's medication, Diantin, was at a level of less than 0.1 ug/mL, which is much lower than the therapeutic range of 10.0-20.0 ug/mL. (R. 123, 125.) Doctors gave plaintiff Dilantin intravenously and discharged him with instructions to take his medication, "as directed," avoid

---

[3] Plaintiff was represented by counsel at the hearing, but proceeds *pro se* on appeal.
[4] There is nothing in the record indicting plaintiff's health status between age sixteen and the time of the alleged onset of disability on December 19, 2002.

driving, operating machinery, and drinking alcohol, and to contact Dr. Patil the following day. (R. 124, 128.)

On December 12, 2003, Dr. Patil completed a "neurology follow up" form, stating that plaintiff's last seizure occurred on December 19, 2002. Dr. Patil reported that plaintiff's seizure disorder was stable at that time and noted that plaintiff complained of back and neck pain, but did not elaborate on how these symptoms affected him. (R. 148-49.)

Plaintiff visited Dr. Patil again on January 21, 2004, after experiencing a seizure on January 16, 2004, while making a delivery at work. (R. 150.) Plaintiff informed Dr. Patil that he was taken to Bellevue Hospital. (*Id.*) Plaintiff also stated that he had been experiencing stress at work and that he had not taken three pills on the day of his seizure. (*Id.*) Dr. Patil noted plaintiff's non-compliance with his medication and prescribed continued use of Dilantin and added doses of Keppra to control plaintiff's epilepsy. (*Id.*)

Plaintiff visited Dr. Patil each month for the next three months. Plaintiff did not report experiencing seizures during those visits. (R. 154-56.) During the March and April 2004 visits, Dr. Patil increased plaintiff's dosage of Keppra. (*Id.*) During plaintiff's April 2004 visit, Dr. Patil discontinued plaintiff's use of Dilantin. (R. 156.)

Plaintiff visited Dr. Patil again on May 16, 2004, reporting that he experienced a seizure on May 8, 2004. (R. 158.) Plaintiff also told Dr. Patil that "[h]e had been taking only 750 mg once a day of Keppra instead of 750 mg" twice daily as prescribed. (*Id.*) Plaintiff also complained of experiencing headaches, neck pain, and lower back pain. (R. 159.)

On June 6, 2004, plaintiff visited Dr. Patil in the company of his brother, Radames Santiago. (R. 160.) During this visit, plaintiff did not report recent seizure episodes. Plaintiff's blood pressure was 170/130 and Dr. Patil directed plaintiff to visit the emergency room at

Elmhurst Hospital. (*Id*.) Plaintiff again complained of experiencing headaches, neck pain, and lower back pain at that time. (R. 161.) Plaintiff's brother told Dr. Patil that plaintiff consumed a six-pack of beer per day. (R. 160.)

On July 16, 2004, plaintiff was admitted to the emergency room at Wyckoff Heights Medical Center ("Wyckoff Hospital") after experiencing two seizures earlier that day. (R. 140, 204-333, 218, 221, 224.) A physical examination of plaintiff showed multiple tongue bites and an extended abdomen. (R. 218.) Plaintiff's breathing was normal, and a CT-scan of his head was negative. (R. 224, 248.) While in the examination room, plaintiff experienced another seizure, which was eventually controlled by multiple doses of Ativan. (R. 219, 220.) His heart rate became tachycardiac, and he was intubated when he went into acute respiratory failure. (R. 220, 228.) Plaintiff's girlfriend provided his medical history to doctors at that time. (R. 221.) She reported that plaintiff suffered from epilepsy since he was sixteen years old and did not take his medication as prescribed. (*Id*.) She also stated that plaintiff frequently abused cocaine, that he had used cocaine the day before, and that he always has seizures after cocaine use. (*Id*.) Emergency room records also revealed that plaintiff drinks beer daily and uses cocaine. (R. 218.)

Doctors admitted plaintiff into the intensive care unit. (R. 231, 266.) Blood tests taken on July 16, 2004 revealed a high level of cocaine and non-theraputic levels of prescribed epilepsy medication present in plaintiff's blood stream. (R. 262-63.) During his hospital stay, the level of Dilantin in plaintiff's blood increased to a therapeutic range. (R. 259.) Plaintiff's condition stabilized and he was discharged on July 26, 2004. Upon his discharge from the hospital, plaintiff was told that he had to take his medications regularly and to stop smoking, drinking alcohol, and using drugs. (R. 213, 217.)

On February 28, 2005, plaintiff underwent a CT-scan of his head at Brooklyn Hospital Center. (R. 202.) The hospital discharged plaintiff without diet or activity restrictions and prescribed Lamictal, Keppra, and Tylenol. (*Id*.) On March 8, 2005, plaintiff underwent a electroencephalographic examination ("EEG"). (R. 203.) The day after this examination, Dr. Patil noted that plaintiff's EEG illustrated "epileptic form activity persistently even on anti-convulsant medication," though it is not clear whether Dr. Patil's based this opinion on the results of the EEG taken on March 8, 2005. (R. 189.)

## C.    Functional Capacity Assessments

Plaintiff's treating physician, Dr. Patil, completed a "seizures impairment questionnaire" on June 6, 2004, which plaintiff's counsel submitted to the Commissioner on September 9, 2004. (R. 141, 142-47.) Dr. Patil reported that he examined plaintiff every four to eight weeks since December 1999 and that his last examination of plaintiff occurred on June 6, 2004. (R. 142.) Dr. Patil diagnosed plaintiff with "seizure disorder" characterized by "generalized, tonic, clonic seizures (grand mal seizures)" and a loss of consciousness. (R. 142-43.) Dr. Patil stated that plaintiff experienced one seizure per month on average, with the last three seizures occurring on May 8, May 24, and June 2, 2004. (R. 143.) According to the report, plaintiff's seizures could be induced by stress. (R. 143, 145.) Plaintiff could not work at heights or operate a motor vehicle, but he could work with machines that require an alert operator. (R. 145.) Dr. Patil noted that plaintiff's symptoms were severe enough to frequently interfere with his attention and concentration. (*Id*.) Dr. Patil also stated that plaintiff could not tolerate low stress work, and that, plaintiff's impairments would result in his absence from work more than three days per month. (R. 145-46.) Finally, Dr. Patil stated that plaintiff's ability to work would be affected by

his need to avoid noise, fumes, gases, temperature extremes, humidity, and heights, and his inability to push, pull, kneel, bend, or stoop. (R. 146.)

On July 23, 2004, Renald Julien, a physical therapist, evaluated plaintiff's residual functioning capacity ("RFC") while he recovered at Wyckoff Hospital. (R. 331-33.) Mr. Julien stated that plaintiff's range of motion was "grossly [within normal limits] throughout" and that his muscle strength rated five and four on a five-point scale for his upper and lower extremities, respectively. (R. 332.) Plaintiff's sensation was grossly intact and plaintiff had no complaints of pain. (R. 332, 333.) Plaintiff stood without assistance and moved his trunk within his base of support. (*Id.*) Mr. Julien stated that plaintiff was limited in balance, strength, ambulation, safety awareness, and in his ability to negotiate stairs. (*Id.*) Plaintiff also needed some assistance performing house chores and shopping. (R. 331.) Finally, Mr. Julien noted that plaintiff had a "wobbling gait pattern." In an effort to assist plaintiff's recovery, Mr. Julien provided plaintiff with a "fall risk/safety prevention program," and balance training, ambulation training, stair negotiation training, and therapeutic exercises to perform at home. (R. 332.)

At the request of the Commissioner, Dr. Patil also completed a medical source statement on February 20, 2005. (R. 184-87.) Dr. Patil indicated that plaintiff's limitations permitted him to lift ten pounds occasionally and less than ten pounds frequently. (R. 184.) Dr. Patil also indicated that plaintiff could either stand or walk for less than two hours during an eight-hour work day and was limited to sitting for less than six hours during an eight-hour work day. (*Id.*) According to Dr. Patil, plaintiff's impairment also caused limitations in his ability to push, pull, kneel, stoop, reach, and handle. (R. 185-86.) Plaintiff could not climb, balance, crawl or crouch. R. 185.) Finally, Dr. Patil noted plaintiff's limitations with regard to temperature extremes,

noise, dust, vibration, humidity and wetness, hazards from machinery and heights, and fumes, odors, chemicals, and gases. (R. 187.)

Dr. Patil completed another "multiple impairments questionnaire" on March 9, 2005. (R. 188-95.) Dr. Patil reported that plaintiff suffered from poorly controlled seizure disorder, cervical radiculopathy, lumbar radiculopathy with symptoms of seizures, neck and lower back pain, recurrent seizures, spasms of the cervical paraspinals, and lumber paraspinals, as well as "trace at bicep jerk," and "absent bilateral ankle jerks." (R. 188, 189.) Plaintiff experienced pain when bending, lifting, pulling, or pushing over ten pounds. (R. 190.) Dr. Patil also stated that plaintiff could sit for three hours and stand or walk for one hour during an eight-hour day. (*Id.*) Plaintiff could lift or carry up to ten pounds occasionally, but could never lift or carry more weight. (R. 191.) Plaintiff experienced minimal limitations in grasping, turning, or twisting objects and in using his fingers or hands for fine manipulations, and experienced moderate limitations in using his arms for reaching. (R. 192.) Finally, Dr. Patil reported that plaintiff could tolerate low stress work, noting that "any high stress job can precipitate seizures." (R. 193.) Dr. Patil listed Keppra, which caused drowsiness and irritability, and Lamictal, which caused no reported side effects, as plaintiff's medications. (R. 192.)

Finally, prior to plaintiff's hearing on March 17, 2005, Dr. Patil wrote two notes concerning plaintiff's medical condition. First, on March 6, 2005, Dr. Patil hand wrote an informal note confirming "that Mr. Melvin Santiago has uncontrolled seizure disorder and has a permanent neurological disability due to seizures." (R. 197.) On March 9, 2005, Dr. Patil wrote a letter stating that plaintiff "is totally disabled without consideration of any past or present drug and/or alcohol use. Drug and/or alcohol use is not the material cause of this individual's disability." (R. 196.) Dr. Patil wrote a similar note after plaintiff's hearing, but before the ALJ

rendered a decision in plaintiff's case.  In that note, dated May 8, 2005, Dr. Patil stated, "[plaintiff] has been noncompliant with antiseisure medication in the past." (R. 337.) Dr. Patil also stated, "[plaintiff] is disabled due to epilepsy, although noncompliance and alcohol abuse has made his condition worse." (*Id*.)

## C.    Medical Expert Testimony

Dr. Brian Anziska testified as a medical expert during plaintiff's hearing.  (R. 404-08, 412-13.) Dr. Anziska has examined many patients suffering from epilepsy during his thirty-year career as a neurologist.  (R. 405.)  Based on a review of plaintiff's medical records and testimony, Dr. Anziska concluded that although plaintiff's medical history has been well documented and establishes a history of poorly controlled seizures, evidence also establishes that plaintiff has a history of non-compliance with medication and substance abuse.  (R. 407.)  Dr. Anziska also noted that plaintiff's medications have been changed.  (*Id*.)  Therefore, Dr. Anziska could not form a medical opinion as to plaintiff's medical condition.  (R. 406-07.)

Dr. Anziska suggested that the record needed to be further developed to determine the extent of plaintiff's compliance with medication.  (R. 407-08.)  The ALJ then asked plaintiff about his compliance with his medication.  Plaintiff acknowledged that he does not always comply with taking his medication, as prescribed.  (R. 408.)  Plaintiff also asserted that during the sixty days prior to the hearing, he took his medication, as prescribed, and experienced one seizure during that time period.  (R. 409-10.)  After hearing plaintiff's testimony, Dr. Anziska testified that there is no evidence in the record suggesting that if plaintiff were compliant with his medication, his seizures could not be controlled.  (R. 412.)  Dr. Anziska also noted that it is impossible to determine whether plaintiff's compliance with his medication would curb his seizures, but that, "being fully complaint reduces the frequency of seizures" and suggested that,

the evidence established that when plaintiff has been fully compliant, he experienced fewer seizures. (R. 413.) Finally, Dr. Anziska stated that "taking alcohol, cocaine, not taking medication, increases the frequency and severity of seizures in cases of epilepsy." (*Id.*)

**D.    ALJ's Decision**

After reviewing the record and testimony in this case, the ALJ applied the five-step sequential analysis set forth in 20 C.F.R. §§ 404.1520 and 416.920. The ALJ resolved step one in plaintiff's favor, determining that plaintiff has not engaged in substantial gainful activity since his alleged onset date. (R. 18.) Under step two, the ALJ found that plaintiff's seizure disorder is a "severe" impairment as defined by the Act because the "condition more than slightly compromises his overall ability to perform basic work activities." (*Id.*) The ALJ resolved step three against plaintiff, finding that his impairments did not meet or medically equal one of the impairments listed in sections 11.02 and 11.03 of Appendix 1 or any other listed impairment. (R. 18-19.) In step four, the ALJ analyzed plaintiff's RFC and determined that plaintiff's impairments prevented him from performing his previous job as a driver and courier. (R. 20-21.) Finally, under step five, the ALJ held that although plaintiff could not perform his past job, plaintiff had the RFC "to perform substantially all of the full range of medium work."[5] (R. 23.)

**E.    Additional Evidence Submitted to the Appeals Council**

Plaintiff submitted additional evidence to the Appeals Council on December 6, 2005 in the form of a document from Wyckoff Hospital entitled "Multidisciplinary Discharge Plan/Instructions & Education," indicating that the hospital discharged plaintiff on November 15, 2005, after he experienced a "breakthrough seizure" with "bronchial asthma." (R. 340-41.) Plaintiff also submitted additional evidence to the Appeals Council on May 3, 2006. (R. 345.)

---

[5] Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

Plaintiff submitted documents indicating that, on August 16, 2005, he suffered two seizures, injuring his shoulder during the first episode.  (R. 362.)  Plaintiff told doctors that he ran out of medication seven days earlier and that his last seizure occurred in July 2005.  (R. 364, 366.)  Finally, plaintiff submitted documents indicating that he experienced a seizure in May 2006.  (R. 368-74.)

DISCUSSION

**A.      Standard of Review**

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. §§ 405(g), 1383(c)(3).  A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998).  The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act."  *Echevarria v. Sec'y of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir. 1982) (internal quotations omitted).  The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  A remand

by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).

In light of plaintiff's *pro se* status, the court will view the facts most favorably to plaintiff, the non-moving party. Further, the submissions of a *pro se* litigant must be construed liberally and interpreted "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).

**B.      Disability Claims**

To receive disability benefits, claimants must be "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months. *Id.* § 423(d)(1)(A). The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. §§ 404.1520 and 416.920. If, at any step, the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there. First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. §§ 404.1520(b); 416.920(b). Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education or work experience. Impairments are "severe" when they significantly limit a claimant's physical or mental "ability to conduct basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c). Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in Appendix 1.[6] *See* 20 C.F.R. §§ 404.1520(d); 416.920(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's RFC in steps four and five. 20 C.F.R. §§ 404.1520(e); 416.920(e). In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work." 20 C.F.R. §§ 404.1520(e); 416.920(f). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience. If so, the claimant is not disabled. 20 C.F.R. §§ 404.1520(f); 416.920(g). At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F.2d at 642).

## C.    Application

The Commissioner seeks judgment on the pleadings, contending that the ALJ's decision is supported by substantial evidence and the relevant law was correctly applied. The

---

[6] 20 C.F.R. pt. 404, subpt. P, app. 1.

Commissioner further argues that the additional evidence plaintiff submitted to the Appeals Council would not change the ALJ's decision, because it reflects evidence already contained in the record. Plaintiff opposed the motion, contending that he continues to experience frequent, uncontrolled seizures, and although the ALJ determined that he could perform medium work, no employer would hire someone with his medical condition.

### 1. Substantial Evidence Supports the ALJ's Determination that Plaintiff's Impairment Does Not Meet or Equal a Listed Impairment

Plaintiff suffers from epilepsy and has experienced seizures since age sixteen. (R. 337.) The ALJ determined that plaintiff's impairment was severe but did not meet or medically equal the requirements of any of the impairments described in Appendix 1.[7] (R. 18.) To meet or equal the requirements for epilepsy under section 11.02, a claimant must demonstrate the following: a convulsive disorder (grand mal or psychomotor), with seizures occurring more frequently than once per month in spite of at least three months of prescribed treatment, and daytime episodes (characterized by loss of consciousness or convulsive seizures) or nocturnal episodes manifesting residuals which interfere significantly with activity during the day. 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.02. To meet or equal the requirements for epilepsy under section 11.03, a claimant must demonstrate the following: nonconvulsive epilepsy (petit mal, psychomotor, or focal), with seizures occurring more frequently than once per week in spite of at least three months of prescribed treatment, and alteration of awareness or loss of consciousness and transient postictal

---

[7] The ALJ also found that Dr. Patil's diagnosis of plaintiff's cervical and lumbar radiculopathy and plaintiff's complaints of lower back and neck pain did not meet or equal any of the listed impairments, because such ailments were not supported by Dr. Patil's clinical notes or other objective medical evidence and because plaintiff did not complain of them in his application for disability benefits or during the March 17, 2005 hearing. Plaintiff also failed to assert his right to DIB and SSI in light of these ailments in his complaint before this court. (Compl. ¶ 4.) As plaintiff has never raised these ailments as a basis for DIB or SSI, the court will not consider them in its review.

manifestations of unconventional behavior or significant interference with activity during the day. 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.03. On the record of this matter, the ALJ properly concluded that plaintiff does not qualify for either of these disabling ailments because there is no evidence establishing that plaintiff's seizures occurred more than once per month in spite of at least three months of prescribed treatment.

During the time period covered by the administrative record—December 19, 2002 to August 16, 2005—plaintiff experienced ten seizure episodes. (R. 120-22, 150, 158, 143, 221, 362, 410.) At least seven of those seizure episodes occurred after plaintiff failed to take his anti-seizure medication as prescribed. Evidence of plaintiff's non-compliance with medication prior to these seven seizure episodes is established by plaintiff's own testimony during his hearing before the ALJ, medical reports made by doctors who treated plaintiff after he experienced these seizures, laboratory test results confirming non-therapeutic levels of medication in plaintiff's blood stream at the time of the seizures, and from a statement made by plaintiff's treating physician. (R. 123, 125, 150, 158, 221, 263, 337, 364, 366, 408, 409.) Plaintiff's live-in girlfriend also told doctors that plaintiff did not comply with prescribed medication and abused cocaine, always experienced seizures after he used cocaine, and had abused cocaine before the two seizures he experienced on July 16, 2004. (R. 221.) Plaintiff's brother also advised Dr. Patil that plaintiff consumed a six-pack of beer per day. (R. 160.)

When plaintiff visited Dr. Patil on May 16, 2004, he reported experiencing a seizure on May 8, 2004, and that he had only been taking 750 mg of his anti-seizure medication once daily, rather than twice daily, as prescribed. (R. 158.) According to a report authored by Dr. Patil on June 6, 2004, plaintiff also experienced seizures on May 24, 2004, and June 2, 2004. (R. 143.) Clinical notes taken by Dr. Patil during his June 6, 2004 examination of plaintiff, however, do

not indicate that plaintiff experienced seizures on those dates. (R. 160.) During plaintiff's hearing, he testified that he experienced a seizure in February 2005 despite his compliance with his medication. (R. 409-10.) Thus, the record is devoid of any evidence that plaintiff experienced more than one seizure per month in spite of at least three months of prescribed treatment. Accordingly, the record contains substantial evidence establishing that, plaintiff's ailments could not possibly meet or medically equal the listed impairments under section 11.02 or section 11.03. *See Bolden v. Commissioner of Social Security*, 556 F. Supp. 2d 152, 163 (E.D.N.Y. 2007) (finding substantial evidence in the record to support the ALJ's conclusion that plaintiff did not meet the requirements under Listing section 11.02 where plaintiff's repeated failure to comply with anti-seizure medication as prescribed was documented by objective medical tests and opinions by plaintiff's treating physicians); *Vazquez v. Apfel*, 97-CV-5370, 1998 WL 542324, at *6 (S.D.N.Y. Aug. 24, 1998) (finding substantial evidence in the record supporting an ALJ's conclusion that plaintiff did not meet the requirements for Listing section 11.02 where objective medical evidence and professional opinions indicated that plaintiff failed to take anti-seizure medication as prescribed).

### 2.    Substantial Evidence Supports the ALJ's Determination that Plaintiff Retained Residual Functional Capacity To Perform Work In the Economy

In determining plaintiff's RFC, the ALJ resolved step four in plaintiff's favor, holding that he could not perform "past relevant work" as a driver and courier due to his inability to engage in heavy lifting or carrying, and his inability to drive. (R. 20-21, 23.) The ALJ next found that during the disputed period, plaintiff retained the RFC to lift, carry, push, or pull up to twenty-five pounds frequently and up to fifty pounds on occasion, to sit between six and eight hours a day, and to stand and walk for up to six hours a day. (R. 22-23.) The ALJ also held that plaintiff's non-exertional limitations included avoiding climbing ladders and working around

dangerous machinery or at unprotected heights. (R. 22.) Based on these findings, the ALJ determined that plaintiff remained capable of performing a full range of medium work, which is defined by the regulations as work that "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). "If someone can do medium work, . . . he or she can also do sedentary and light work." *Id.*

The ALJ determined that plaintiff was a "younger individual" as defined by 20 C.F.R. §§ 404.1563 and 416.963, who had a high school education plus one year of college, and whose past work was unskilled or semi-skilled in nature. (R. 22.) The ALJ also concluded that plaintiff's non-exertional limitations "have little, if any, impact on his medium occupational base." (*Id.*) As such, the ALJ properly relied on the Medical-Vocational Guidelines, contained in the Code of Federal Regulations, in reaching the conclusion that plaintiff was not disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00 *et seq.*; *see Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986) (holding that if a claimant's non-exertional limitations do not "significantly limit the range of work permitted by his exertional limitations," and the "guidelines adequately reflect a claimant's condition, then their use to determine disability status is appropriate"). The application of these Medical-Vocational Guidelines directed a finding that plaintiff is not disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 203.28.

In making this finding, the ALJ considered the opinions of plaintiff's treating physician, Dr. Patil. (R. 21.) A treating source's medical opinion regarding the nature and severity of an impairment is given controlling weight when supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993) (*citing* 20 C.F.R. 404.1527(d)). When a treating source's opinion is not given controlling weight, the proper weight accorded

depends upon several factors, including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Comm'r of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R. § 404.1527(d)). Additionally, the ALJ must always "give good reasons" in her decision for the weight accorded to a treating source's medical opinion. *Id.* There are, however, certain decisions reserved to the Commissioner. Such decisions include the determination that a claimant is "disabled" or "unable to work." 20 C.F.R. § 404.1527(e)(1). "That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

The court finds that while the ALJ did not give controlling weight to the opinions of plaintiff's treating physician, he "considered, but discounted" them, giving good reasons for doing so. (R. 21.) Those reasons are supported by the record. Dr. Patil stated that plaintiff experienced one seizure per month on average and that plaintiff's seizures were "poorly controlled" and "uncontrolled." (R. 143, 188, 197.) On several occasions, Dr. Patil also concluded that plaintiff was "disabled" due to epilepsy. (R. 196, 197, 337.) The ALJ considered but rejected those opinions because Dr. Patil's "conclusion not only is inconsistent with the overall thrust of the evidence of the record and the expert testimony of Dr. Anziska, but is not even consistent with, or corroborated by, the doctor's own treating records." (R. 21.) The court agrees. For example, Dr. Patil's treating notes do not reflect that plaintiff's seizures occurred once per month on average and, as noted, the record clearly illustrates that plaintiff's seizures

almost always followed a period of non-compliance with medication and/or alcohol or drug abuse. (R. 18-19.)

The Act establishes that "an individual shall not be considered to be disabled for purposes of this title [42 U.S.C. § 1381 *et seq.*] if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 1382c(A)(3)(J); *see also* 42 U.S.C. §§ 423(d)(2)(c) (same); 20 C.F.R. § 404.1535(a) (same); 20 C.F.R. §416.935(a) (same). The regulations require that an inquiry be made as to "whether [the Agency] would still find [a claimant] disabled if [the claimant] stopped using drugs or alcohol." 20 C.F.R. §§ 404.1535(b)(1); 416.935(b)(1). If the "remaining limitations," considered independently of any drug and alcohol abuse, would not be disabling, then drug addiction and/or alcoholism is a contributing factor material to the determination of disability and the claimant is not disabled. 20 C.F.R. §§ 404.1535(b)(2)(i); 416.935(b)(2)(i). If the claimant would be disabled regardless of the drug or alcohol use, then it is not a contributing factor. 20 C.F.R. §§ 404.1535(b)(2)(ii); 416.935(b)(2)(ii). The burden, however, is on the claimant to prove that substance abuse is not a contributing factor material to the disability determination. *Doughty v. Apfel,* 245 F.3d 1274, 1281 (2d Cir. 2001).

Plaintiff has failed to meet this burden. Dr. Anziska, the independent expert, concluded that "being fully compliant [with medication] reduces the frequency of seizures," that when plaintiff has been fully compliant, he experienced fewer seizures and that, "taking alcohol, cocaine, not taking medication, increases the frequency and severity of seizures in cases of epilepsy." (R. 413.) The record supports this opinion and the conclusion of the ALJ that, "non-compliance [with medication], alcohol abuse, and cocaine abuse were, at the very least, contributing factors to those seizures, of not the outright inciter of them." (R. 20.) Therefore,

substantial evidence supports the ALJ's determination that plaintiff retained the RFC to perform medium-level work.

### 3. Consideration of New Evidence

Under the Act, a claimant may "submit new and material evidence to the Appeals Council when requesting review of an ALJ's decision." *Perez v. Chater*, 77 F.3d 41, 44 (2d Cir. 1996). "If the new evidence relates to a period before the ALJ's decision, the Appeals Council shall evaluate the entire record including the new and material evidence submitted . . . [and] then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." *Id*. To obtain a review of such evidence, the claimant must show that "the proffered evidence is (1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative." *Sergenton v. Barnhart*, 470 F. Supp. 2d 194, 204 (E.D.N.Y. 2007) (citing *Lisa v. Sec'y of Health & Human Servs*., 940 F.2d 40, 43 (2d Cir. 1991)). Materiality means "a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently." *Id*.

After plaintiff's hearing, he experienced seizures on August 16, 2005, and in November 2005, and May 2006. Plaintiff submitted evidence related to these episodes to the Appeals Council before it denied plaintiff's request for review on November 2, 2006. As the ALJ denied plaintiff benefits by written decision on August 17, 2005, the only evidence that the Appeals Council should have considered concerned plaintiff's August 16, 2005 seizure. 20 C.F.R. §

404.970(4)(b) ("[T]he Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision.").[8]

Though evidence of plaintiffs' August 16, 2005 seizure is "new" in that it provides insight into another episode experienced by plaintiff, it is not "material" because it represents yet another instance of a seizure occurring during a period when plaintiff was not compliant with his prescribed medication. Plaintiff's medical records indicate that he ran out of medication seven days prior to the August 16, 2005 seizure. (R. 364, 366.) The result of a laboratory test further corroborates plaintiff's non-compliance with medication, because it indicates that the level of anti-seizure medication in plaintiff's blood stream was well below the therapeutic range on that date. (R. 356.) Rather than establishing a "reasonable possibility that the new evidence would have influenced the ALJ to decide plaintiff's application differently," this evidence provides additional support for the ALJ's determination that plaintiff is not disabled. *Sergenton*, 470 F. Supp. 2d at 204. Finally, even if the Appeals Council considered evidence of seizures plaintiff experienced in November 2005 and May 2006, the court is convinced that this would not have influenced the ALJ's decision because plaintiff only experienced two seizures during a seven-month period. Notably, a laboratory test confirms that the May 2006 seizure occurred after yet another instance of plaintiff's non-compliance with medication. (R. 370.) Therefore, remand is not warranted in light of this evidence.

---

[8] In plaintiff's Affidavit in Opposition to Defendant's Motion, he asserts that he experienced thirteen seizures between January 5, 2007 and October 13, 2007. As these alleged events also occurred after the ALJ rendered his decision, the court will not consider them in its review. *Perez*, 77 F.3d at 45 (New evidence "must relate to the period on or before the ALJ's decision.")

**CONCLUSION**

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is granted in its entirety.

SO ORDERED.

DATED:      Brooklyn, New York
            August 14, 2009

_____/s/_____

DORA L. IRIZARRY
United States District Judge